### HENRY PHILLIPS *v.* THE STATE.

1. CIRCUMSTANTIAL EVIDENCE — CHARGE OF THE COURT. — The court having plainly charged the law of the case, as enjoined by the Code of Criminal Procedure, it was not requisite that it should do more, and hence it was not error to refuse superfluous special instructions.   See the opinion for charges on circumstantial evidence held sufficient and correct.   —

2. ORGANIZATION OF JURY — PEREMPTORY CHALLENGE. — In a felony trial, the defendant asked to be furnished a list of the jurors challenged peremptorily or stricken from the list by the State, before he should be required to challenge or strike from the list himself.   *Held*, that such practice is not contemplated by the jury law, and the court did not err in refusing the request.

3. NEW TRIAL. — The reception of the grand jury upon the conclusion of its labors, though it be done during the trial of a cause, and complimentary or congratulatory remarks be made by the court upon discharging it, is not a ground upon which a new trial may be granted, since it cannot be seen in what manner such practice prejudices the rights of the defendant.

4. PRACTICE. — It is within the power of the court to admit evidence at any time of the trial, before argument is concluded, if it appears that such testimony is necessary to the administration of justice.   The importance of this testimony to the due administration of justice must be largely com_ mitted to the discretion of the court below; and its action will not be revised unless its discretion was abused.

APPEAL from the District Court of Burleson.   Tried below before the Hon. S. FORD.

The appellant was convicted under indictment for an assault with intent to murder, and his punishment was assessed at five years in the penitentiary.

Henry Hodges, the prosecuting witness, testified in substance that on the evening of the sixth day of March, 1878,

between seven and eight o'clock, as he, with his family and some friends, sat down to supper, some person fired on him through the window. The charge passed across witness's breast, just below the chin, tearing off his collar-button and part of his collar, cutting a hole through his shirt-front, and passing through the lapel of coat and vest. The sash of the window through which the shot was fired, and a thin calico curtain, were both down. The lower left-hand pane of glass of the lower sash was broken out by the discharge, and a hole was shot through the curtain. The concussion extinguished the lamp. Witness thought at first that he was struck, but on examination, after a light was brought, found that his temple had been cut by flying glass from the window-pane. Witness sent for Mr. Gregg and Mr. Weatherington, living in the neighborhood, and also sent Mr. Armstrong and Mr. Hargrave to Bryan.

Witness, wanting a shot-gun for the last named gentlemen to take with them to Bryan, and remembering that a negro named Felix Phillips, who lived in the yard, had one, asked for it, and was informed by him that the appellant had it. When witness learned this, he again sent for Mr. Gregg, who had returned home, and requested him and Mr. Weatherington to go to appellant's house, which they did that night.

The next morning, Mr. Weatherington, Dr. Lipscomb, and witness, with probably others, found the tracks of some person underneath the window from which the shot had been fired. The tracks seemed to have been made by shoes, both of which were run down to the left. This track witness and party followed in various directions, disclosed by a diagram shown, until they reached the Bryan and Caldwell Road at a point near where it intersects the Dogtown Road at Pitt's Ferry, on the Brazos River, where the tracks were lost. At this point, Dr. Lipscomb and Eddie Forrester came up to the party, bringing the appellant with them.

The party then took appellant up the Dogtown Road, to a soft, muddy place, where one of the tracks had made an impression, and ordered him to make a track near one found there. Appellant hesitated at first, but when made to put his foot down, he seemed to bear his entire weight on it, sinking it up to the top of his shoes, and twisting it as though to spoil the impression. Witness then told him if he did not do better he would be knocked down. He then made a very plain track, and it was exactly like the one they had followed from the house. Appellant then had on the shoes now produced in court.

After the shot was fired into the house, witness found that the load had gone into the wall opposite the window. The load consisted of sixteen good-sized buckshot, and one large ball that looked about the size of a forty-five six-shooter calibre. The tracks seen at the window and at various points along the route were measured, and they corresponded exactly with the measure of appellant's shoes ; and the shoes were also compared with the tracks, and were found to fit them exactly. The tracks left Wilson's house some forty or fifty yards, and at no time went nearer to it.

Cross-examined, the witness said that he had no cause to suspect that the appellant, or any one else, had designs on his life. He had had the appellant in his employ for two years, and had never had a difficulty with him. Had had serious difficulties with other negroes in the neighborhood. Had been engaged in a shooting difficulty in Bryan, some time before. Still, witness did not think that he had cause to apprehend that any one had designs upon his life. Witness found some wadding on his floor after the shot was fired, but did not have it at the trial. It was ordinary light-brown straw or wrapping paper. Has never seen the wadding that Mr. Gregg drew from the gun found at appellant's house. The toe of the right foot-track that witness and party followed seemed to have nothing the matter with

it, but there seemed to have been a nail or tack in it. The peculiar impression might have been made by a torn place in the toe of the shoe-sole, but it did not have that appearance. The plainest impression was in some ploughed ground traversed by the foot-prints. Witness saw where the right foot struck a small sprout and slipped back. A scratch appeared to have been made, as though by a tack or nail. The shoe exhibited has a tack driven through the sole at the toe, the head being on the sole of the shoe.

There are a great many negroes in the neighborhood who wear the same number of shoe as that worn by appellant, and a great many of them run down their shoes, — some to the right, some to the left. Sometimes one shoe is run down one way, and one another ; sometimes, though rarely, they are both run down in the same direction. Witness does not remember that he has ever before seen shoes run down as those exhibited. These shoes are the same the appellant had on the morning after the shooting, when, in the presence of Gregg, he was compelled to compare them with the track followed. These shoes were about No. 8, both run down at the heel to the left, one having a tack in the toe and a slight opening between the front and back upper-leather on one side ; and they show that the right shoe was worn on the left foot, and the left on the right foot.

Reëxamined by State, witness says that the difficulties he had previously had were with T. C. Evans, J. G. Randle, and one Henderson. Had had a shooting difficulty with Randle in Bryan some days before, and after spending several days in Bryan, undergoing examination under *habeas corpus*, had returned home that evening, a short time before the shooting, passing Randle's farm, on which the appellant lived.

John Weatherington, testifying for the State, deposed that when he got to the house of the first witness, being sent for, he found the window-sash shot out, and that a load of some fifteen buckshot and a large ball had gone into the

wall opposite the window.   Also found Hodges's face cut on one side by the glass that was shot out of the window; found tracks underneath the window, such as described by the first witness, and an impression in the ground, made, evidently, by the butt of a gun.   Himself and Mr. Gregg, being armed, went to the house of appellant that night, and, after Mr. Gregg had called several times, saw appellant come to the door, and heard him ask who was there.   When answered "Gregg," he said he did not know Gregg, repeating it twice,— saying, in words, that he did not know "Mr. Gregg or Henry Gregg."   Witness thinks Gregg then said, "What! You don't know Henry Gregg?" to which appellant responded, "Oh, yes! I know Mr. *Henry* Gregg."   Witness and Gregg then passed into the house, and Gregg lit a lantern that he had with him.   Appellant was then asked if he had a gun there, and replied that he had not.   Gregg then asked him where the gun was that he had borrowed from Felix Phillips.   Appellant then reached over the bed, and, getting a gun and handing it over, said, "Here it is."   Mr. Gregg said that one barrel had been discharged.   Appellant said that he had shot a squirrel with it that day, and exhibited a squirrel which seemed to have been recently killed. The other barrel was loaded, but the cap on the tube was exploded.   The empty barrel appeared to witness to have been discharged some time during the previous day, as the burnt powder at the muzzle was still moist.

Gregg then asked appellant where his shoes were, to which he replied that he had none, at the same time pointing to a pair of boots on the floor, and saying, "Those are the only shoes I have got."   Gregg then picked up a shoe from under the bed, when appellant said, "Yes, I have an old pair of shoes that I wear when ploughing," and then reached under the bed and got the other shoe.   They were men's shoes, about No. 8, and were run down at the heel, both to the left.   Shoes exhibited were identified by witness as the same worn by appellant on the morning after the shooting.

Witness saw the shoes compared with the tracks spoken of by the first witness, and they fitted exactly. Witness examined the shoes, and found them dry, with a small piece of mud sticking to the sole in one place. They appeared to be warm, as though dried by the fire.

While witness and Gregg were examining the gun, appellant asked, two or three times, "What's the matter?" Mr. Gregg replied, "There has been some devilment done, and you are suspected of doing it." This was before the shoes were asked for. Gregg then told appellant that some one had shot at Hodges, and asked if he had not heard of it, and appellant replied that he had not. Witness corroborated Hodges as to what occurred on the morning after the shooting, about following the track, etc.

On cross-examination, witness is certain that the appellant at first denied knowing Mr. Gregg. Has not had much experience with fire-arms, and does not know the composition of gunpowder. Has noticed, however, that a gun that is dirty, and has not been fired in some time, will get moist on the inside in damp weather. The wife of appellant was lying on the bed when witness and Gregg went into the house. Does not recollect that she said more than to express surprise when Gregg told appellant that Mr. Hodges had been shot at. When appellant was told that he was suspected of having done the shooting, he straightway denied it, and said that he "liked Mr. Hodges, and would not think of doing such a thing." Witness did not vary his testimony in regard to the tracks and the shoes.

Henry Gregg, for the State, corroborated the last witness in every essential point. He testified, in addition, that when he took up the gun to examine it, he asked appellant what kind of shot the empty barrel contained when discharged, at the time he claimed to have killed the squirrel. He replied that it was ordinary squirrel-shot, two loads of which he had borrowed of Turner Jackson. Witness then took the ramrod and drew the remaining load, finding it charged with

ordinary squirrel-shot.   Witness saw the wadding said to have been picked up on Hodges's floor after the shooting. It was not the same as that drawn out of the gun by witness. This last was heavy brown paper, and that picked up by Hodges was thinner and of a lighter color.

On cross-examination, witness says that he did not hear appellant say that he did not know him, when, with Weatherington, he called appellant out of the house.   Heard appellant say some thing, but did not understand him.   Witness knows appellant well, and is well known by appellant. Witness corroborated the first two witnesses in regard to the tracks, measurement, etc., and identified the shoes.   He corroborated the witness Weatherington in regard to the shoes being unnaturally warm, as though dried by the fire, and in regard to one of the shoes having a little mud on the sole.   There were a few live coals heaped up in the ashes in the fireplace.   Is certain appellant denied having heard of the shooting when witness was at his house that night, which was about eleven o'clock.   Appellant, explaining how the boots shown witness had become muddy, said that he went to the ferry to get his horse, which he had lent to Oliver, who lived there.

J. P. Oliver, for the State, testified that appellant came to the ferry, where he was living, late on the night of the shooting, and that he (witness) told him that Hodges had been shot at.   Appellant asked witness how he knew it, and witness answered that he had put Hargrave and Armstrong across the river, and was told by them when crossing.   Appellant did not come about witness's house any more that night.

On cross-examination, witness does not know what time it was when appellant came to the ferry.   Armstrong and Hargrave crossed there between nine and ten o'clock, and it was after that time that appellant came to the ferry. Witness had borrowed a horse from appellant that day. Did not, though he could have got the horse if appellant

had wanted him that night. Witness did not tell appellant that the gate was locked, nor that he could not get the horse that night.

Rena Phillips, the wife of the appellant, testifying for the defence, deposed that on the evening when Hodges was shot at, a shower of rain came up about three o'clock, driving appellant, who was then ploughing in the field, into the house. Appellant laid down on the bed, saying he was sick, and directed witness to hurry up supper. After supper was disposed of, appellant went to bed, and did not get up until eleven o'clock that night, when he went to Mr. Oliver's, at the ferry, to get his horse which he had loaned to Mr. Oliver. He returned in the half of an hour, and after going to bed immediately, did not leave the house again that night. Witness urged appellant to go for the horse directly after supper, but he declined, saying he was sick, and would get the horse early next morning. About eleven o'clock, witness awakened the appellant, and urged him to go for the horse, as they would need him early next day to plough. Barbara Denny passed witness's house, going from Pitts's Ferry to Belle Evans's, about dark. Appellant was then in the house. There was about the house neither ammunition nor brown paper. Appellant shot a squirrel that day, with a gun which was left with him by Moses Carter to be pawned. He got the ammunition from Turner Jackson. Appellant had an old pair of shoes he wore when ploughing, and a pair of new boots.

On cross-examination, witness says she went to bed shortly after dark, and slept very soundly, but knows that appellant left the house but the one time spoken of, for he could not leave the bed without her knowing it. About eleven o'clock she woke appellant up, and, after relating a dream which she had had, urged appellant to go for the horse. Appellant then got up, saying that he would take the dogs along and have a little hunt, returning home by the ferry. He returned within the half of an hour home,

and said that he did not get the horse, because Mr. Oliver told him the gate was locked, and he could not get him until morning. Appellant did not remain away longer than a half-hour. He undressed immediately and went to bed, and told witness that her dream had come to pass, and that some one had shot at Mr. Hodges. Witness dreamed of finding a turkey's nest, and that birds were lighting upon Mr. Hodges's house. Appellant told witness that Oliver told him that two men who crossed the ferry that night told him of some one shooting at Hodges.

About fifteen minutes after the appellant returned from the ferry, Mr. Henry Gregg and another man came to the house. Gregg lit a lamp and asked appellant where his gun was, to which appellant responded that he had sold it. He then asked appellant where the gun was that had been left with him to pawn. Appellant immediately answered, "Here it is," and handed it over. Gregg then asked for his shoes, and he handed over the old shoes spoken of. Appellant did not deny having shoes; and Mr. Gregg did not pick up one of the shoes, but appellant picked up both and handed them over. Witness was not more than ten feet distant from the parties, and would have heard appellant deny it, if he did, as she heard all of the conversation. Gregg asked about the discharged barrel, and appellant told him that he had shot a squirrel that day, and got the squirrel and showed it.

Turner Jackson testified, for the defence, that, at about eleven o'clock on the day Hodges was shot at, appellant came to his house, and asked for some ammunition to load a gun with, saying that the hawks were bothering him. Witness gave him two loads of powder and large-sized squirrel-shot, and wadded it with thick brown "hardware" wrapping-paper; also gave him two caps, and appellant went off. A short while after, witness heard a gun fire.

Felix Phillips, who lives within twenty yards of Hodges's house, and on Hodges's place, testified, for the defendant,

that he (witness) owns a double-barrelled shot-gun, which he had authorized Mose Carter to pawn for money, and which gun Carter took to appellant, on the evening before the shooting, to get him to pawn it for him. Mose Carter corroborated this testimony of Phillips's.

The testimony of Dave Phillips and George Porter, deposing for the defence, is identical, and to the effect that they lived with appellant, and were that day at work with him in the field. During the day, about twelve o'clock, the dogs treed a squirrel. Appellant got the gun from the house and shot it, snapping the cap on the other barrel at another squirrel. When the shower of rain came up, they all went to the house, where they stayed. After supper, about dark, these two witnesses went to the ferry to get a horse appellant had loaned Mr. Oliver; but as Mr. Oliver was not at home, they did not get it. They left appellant at home, and found him there on their return, still in bed. The witnesses were in the house all the time after they came back, and know that appellant did not leave before they went to sleep. Were awake when appellant got up to go down to the river to see about the horse, but don't know what time it was. Dave Phillips is of no kin to appellant or his wife, though he was raised by them. Porter is step-son to Rena Phillips, appellant's wife.

Barbara Denny, for the defence, testified that she cooked for Capt. Pitts, at the ferry, the last spring, when some one shot at Mr. Hodges. On that evening, at good dark, she passed appellant's house, going within ten feet of it, *en route* for her own house, about one-quarter of a mile from Hodges's. She heard Rena Phillips talking to some one, who had a man's voice, though she did not know who it was. Witness walked home very fast, and immediately commenced pulling off one of her shoes, during which operation she heard the discharge of a gun over at Mr. Hodges's. Heard but the one report.

Henry Gregg, recalled for the State, testified that it was

a mile, or a little more, from the house of Hodges to that of appellant, which is between Hodges's and the river. Belle Evans's, or Belle Christmas's, where the witness Barbara Denny lived, and called "home," is between the houses of Hodges and appellant, and about a quarter of a mile from the house of the former.

V. D. Terrebone, for the State, testified that, three or four days before the shooting, and while the *habeas corpus* examination of Hodges was pending in Bryan, for the killing of Rush Randle, appellant came to the store of witness and asked what witness thought would be done to Hodges; to which witness replied that he "thought nothing would be done." Appellant then said "if the law did nothing with Hodges, somebody else would." He also spoke of a debt of five dollars which he owed witness, promising to pay it in a few days.

On cross-examination, witness says that he has heard others say that the difficulty between Hodges and the Randles was not over, but had heard no one else speak of it as appellant did. Appellant did not say that he would do any thing himself. Others have said that Hodges ought to be punished.

No brief for the appellant.

*Thomas Ball*, Assistant Attorney-General, for the State.

WINKLER, J. The appellant was convicted of an assault with intent to murder one Henry Hodges, alleged to have been committed on March 6, 1878.

On the trial below, the judge presiding gave to the jury the following charge on the subject of circumstantial evidence: "The burden of proof is upon the State to establish by evidence the guilt of defendant. This may be done by either positive or circumstantial evidence. The evidence in this cause being circumstantial, you are charged that the

law is, that, to warrant a conviction, the circumstances in evidence must be of such a conclusive and satisfactory character as to establish the guilt of the defendant to a moral certainty, and to exclude every reasonable hypothesis consistent with his innocence.   *   *   *   That is to say, if the jury can explain or account for the facts and circumstances in evidence before them in any reasonable way consistently with the innocence of defendant, they must do so, and acquit. On the other hand, if the jury find that the facts and circumstances in evidence before you cannot be accounted for upon any reasonable grounds consistently with the innocence of defendant, then it is your duty to convict.   If the facts and circumstances in evidence are such as to establish the guilt of the defendant with a degree of certainty sufficient to satisfy the mind of a man of ordinary understanding, and so to convince him that he would act upon that conviction in matters of the highest importance to his own interest, the jury would be warranted in finding him guilty.   Satisfactory evidence is such as ordinarily satisfies an unprejudiced mind beyond a reasonable doubt.''   Charges on this subject were asked by the counsel representing both the State and the accused, both of which were refused by the court.

We are of opinion that this charge of the court sufficiently informed the jury as to the certainty required to be shown by circumstantial evidence in order to warrant a conviction on this character of testimony, especially when considered in connection with those portions of the charge of the court which immediately follow the paragraph set out above.

. The judge having plainly stated '' the law of the case,'' as it was his duty to do agreeably to the provisions of the Code of Criminal Procedure, art. 595, it was not required of him to do more, and hence he did not err in refusing to give the additional instructions asked ; not because the charges asked were or were not correct enunciations of the law, but because they were unnecessary under the circumstances.

There was no such error in the charge of the court, or in refusing the charges asked, as was calculated to prejudice the rights of the accused. On the contrary, the charge fairly submitted to the consideration of the jury the only question of moment in controversy, to wit, Was the accused the person who fired the shot? There is no room for controversy that some one attempted to shoot the assaulted party, through a window, at night, and as little room for doubt that the shot was fired with intent to murder.

Five bills of exceptions were taken to as many different rulings of the court on the trial below. The first bill of exceptions raises a question of practice under sect. 22 of the jury law of 1876. The section, among other things, directs that, in case of a criminal trial in the District Court, after the proper number of names shall have been drawn in the manner required, and such names have been entered, as drawn, on two slips of paper, the slips having the names drawn shall be handed, " one to the prosecuting attorney, and the other to the defendant, or his attorney ; from which, * * * in a criminal case, each may strike a number of names equal to the number of peremptory challenges allowed them by law." The list, after the striking has been done, is to be returned to the clerk, who shall, if in the District Court, " call the first twelve names not erased ; " and these twelve compose the jury to try the case. By this process of striking, each party avails himself of standing aside such of the persons whose names appear on the list furnished him by the clerk as he would challenge peremptorily, to the extent of the number of peremptory challenges allowed by law in the particular case for the trial of which the jury is then being formed.

The bill of exceptions recites that, " when the counsel for the defendant was called upon to make his challenges, * * * he moved the court to permit him to look at the list of jurors from which the counsel for the prosecution had struck the names of jurors challenged by the

State, that he (defendant) might be advised of the challenges made by the State before he was called upon to challenge.'' This request was refused by the court, as the bill of exceptions shows. In this ruling we find no error; if for no other reason, because the statute has not so provided. Counsel had the means of ascertaining the State's challenges, or rather who had not been challenged, by the call of the names remaining after the striking had been completed, for the names called were necessarily of those remaining on the list after each party had struck off his peremptory challenges; and we cannot discover any injury which could result to the accused by withholding from him the names of the offered jurors challenged by the State. Still, whilst we deem the matter of but little moment any way, we are unable to see any good reason for withholding this information, as the State ought not to desire, and neither party should be permitted, to obtain any undue advantage in forming a jury in any case; and it is not intimated that this was attempted in the present case.

Bills Nos. 2 and 3 relate to the rulings of the court upon the evidence; upon which we do not deem it necessary in this opinion to say more than that in the rulings complained of we find no material error.

Bill of exceptions No. 4, as stated by counsel, was not signed; but the judge, instead of signing the bill of exceptions, or refusing to sign it, makes a statement, in which he says: '' The above paper [referring to the paper prepared by counsel] having been presented to me for approval as a bill of exceptions, I submit, at the request of defendant's counsel, this statement.'' From this *statement* we gather that, some time during the progress of the trial, the grand jury, having finished their labors for the term, appeared in court, and having returned into court all the indictments found by them, '' announced that they had no further business before them, and were ready to be discharged, and asked to be allowed to make an oral report through the

county attorney. Among other things, they referred to the small number of bills found, and to the obvious decline in the amount of crime committed in the county. The court, in reply, remarked that this was owing, no doubt, in a large degree to the operation of the new jury law, etc.; and this was seen in the greater number of convictions for capital offences, as shown by cases affirmed by the Court of Appeals." The judge proceeds as follows : " The court made a few other commonplace remarks to the jury, and discharged them. No exception was saved by the defendant, and no objection made, or notice taken whatever of it; and the court did not conceive that it could be suspected that these remarks could influence in any manner the verdict in this or any other cause pending in court, until two days after, when this cause was assigned as a ground for a new trial by the defendant."

We venture the remark that the oldest practitioner in the courts of Texas cannot remember when the practice did not obtain of permitting the grand juries to come into court to be discharged, when through their labors, and of being complimented from the bench when they had faithfully performed their duties. This time-honored custom we are not inclined to interrupt, and we are unable to see that its observance is at all likely to prejudice the rights of litigants generally; and in this particular case we have not seen that it had, or was likely to have had, any such effect. There was no error in this action of the court, to the defendant's prejudice.

It appears from the fifth bill of exceptions that, after the defendant had closed his testimony, the court permitted the counsel for the State to introduce a witness to prove, as he stated, " a piece of original testimony, that he did not know existed before." This the court permitted, over objections by the defendant, informing him that he would be allowed to introduce such evidence, in response to the new matter introduced, as he might desire. In this action of the court

there was no error.   The Code of Criminal Procedure, art. 581, provides that "the court shall allow testimony to be introduced at any time before the argument of a cause is concluded, if it appear that it is necessary to a due administration of justice." Pasc. Dig., art. 3046.

The authority conferred to introduce testimony at an irregular time must be largely confided to the discretion of the judge as to whether the testimony is necessary for the due administration of justice, and will not be revised on appeal except in a clear case of abuse of that discretion.

The several grounds of the motion for a new trial are substantially the same as the errors complained of in the several bills of exception we have considered, with the additional ground that the verdict is contrary to the law and the evidence.   We are of opinion there was no good cause shown for the granting of a new trial.

It is a matter of regret that the appellant has not been represented by counsel in this court; yet we have not only considered the case as made by the bills of exception and the causes alleged for a new trial, but have examined the whole case as presented by the record, and fail to discover other than that the appellant has had the benefit of a fair and impartial trial; that, throughout, the court carefully guarded all the rights of the accused; and that he has been adjudged guilty of what appears to us a vile attempt at assassination.

The judgment of the District Court is affirmed.

*Affirmed.*